NOT FOR PUBLICATION

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| : | |
| SATURN OF DENVILLE NEW JERSEY,: | **Hon. Dennis M. Cavanaugh** |
| LP, and STUART LASSER, : | |
| : | **OPINION** |
| Plaintiffs, : | |
| : | Civil Action No. 08-CV-5734 (DMC) |
| v. : | |
| : | |
| GENERAL MOTORS CORP., SATURN : | |
| DISTRIBUTION CORP. and SATURN : | |
| CORP., : | |
| : | |
| Defendants. : | |
| : | |

DENNIS M. CAVANAUGH, U.S.D.J.:

This matter comes before the Court upon motion by Plaintiffs, Saturn of Denville New Jersey, LP and Stuart Lasser ("Plaintiffs") for a preliminary injunction to enjoin Defendants, General Motors Corp., Saturn Distribution Corp., and Saturn Corp., ("GM") from enforcing an exclusivity provision in the dealership agreement between Plaintiffs and GM; and upon motion by GM to supplement the record. After carefully considering the submissions of the parties and the arguments presented by the parties at oral argument, and based upon the following, it is the finding of this Court that GM's motion to supplement the record is **denied**; and Plaintiffs' motion for a preliminary injunction is **denied**.

I.   **Background**[1]

_____**A.   Factual Background**

In the 1980s, Saturn Corp. ("Saturn") was founded as a people oriented organization with a focus on core values and accountability to customers, retailers and employees. From the outset,

_____
[1]The facts set-forth in this Opinion are taken from the Parties' respective papers.

Saturn distinguished itself from its parent, GM, and all other companies in the market; this is evidenced by Saturn's original slogan, "A Different Kind of Company.  A Different Kind of Car." This new approach extended to its dealerships.  Dealers were expected to expend a great deal of time and effort to create the desired sales environment.

As part of Saturn's search for new retailers, it approached Plaintiff, Stuart Lasser, a veteran automobile dealer in northern New Jersey.  Mr. Lasser was eventually persuaded to adopt the Saturn philosophy.  In April 1991, Saturn of Denville opened on Route 10 in Denville, New Jersey.  As the brand became established, Saturn advised retailers to expect expanded sales. In 1997, Saturn advised its dealers that increased sales volume would require additional sales and service facilities in most marketing areas including Plaintiffs'.  In reliance on these promises, Plaintiffs undertook efforts, and incurred significant expenses, to secure additional properties.  Plaintiffs also enlarged and updated their showroom and service areas at the Denville location.

In 1999, with sales slipping and no new products on the horizon, Saturn turned away from its founding philosophies and adopted traditional "price-based" marketing.  GM became more involved in Saturn's operations and eventually brought the Saturn brand into the GM fold.  This resulted in Saturn sharing its engineering, design, and marketing efforts with other GM brands. Plaintiffs allege that GM started using Saturn to "test market" new vehicles for its other divisions. They claim that every new car model launched since 2003, including all models in its current line are not exclusive to Saturn.  Moreover, contrary to the customary approach to new product introductions, Saturn launched each of its new models with little fanfare, inadequate incentives, and limited advertising budgets.  In contrast, the introductions of similar models by the other GM brands were accompanied by increased incentives and substantially larger marketing budgets.  Having been effected by a lack of unique models, limited advertising, and low incentives over the past several years, sales of Saturn vehicles have dropped dramatically.

2

Plaintiffs have operated a Saturn Dealership in good standing for over eighteen years. In July 2008, GM's newly appointed General Sales Manager, Mr. Sterling Wesley called a meeting of all Saturn retailers in the New York District marketing area, including Plaintiffs. During this meeting, Mr. Wesley advised the retailers in attendance that GM was "out of money" and instructed them that they were on their own and should "do what they had to do" to survive. In reaction to this meeting, Plaintiffs submitted an application to obtain a KIA franchise with the intention of combining the Saturn facility with a KIA dealership. Plaintiffs planned to subdivide the building and offer exclusive retail sales areas to both brands.

On August 12, 2008, Plaintiffs received official notification from KIA that its application was approved subject to GM approval. On August 15, 2008, Plaintiffs sought GM approval. Plaintiffs' proposal outlined a detailed plan explaining how Plaintiffs would protect the integrity of both brands, for example, the plan included separate entrances for the Saturn and KIA showrooms. Saturn denied Plaintiffs' request. On September 22, 2008, Plaintiffs asked for reconsideration of its request. On September 26, 2008, Jonathan Skidmore, Saturn's Regional Manager, requested a more comprehensive presentation. Plaintiffs responded with a more detailed proposal in which Plaintiffs added plans for separate customer service areas. By letter dated October 30, 2008, Saturn denied Plaintiffs' second request. On February 17, 2009, GM filed an updated plan for its long term financial viability with the Department of Treasury as part of a submission requesting an additional $16.6 billion from the United States taxpayers. Within this plan GM reiterated that it will focus its attention and resources, on its four "core brands." GM committed to cutting labor, closing manufacturing plants, and eliminating dealerships. Saturn is not one of GM's core brands. In fact, GM recently announced its intention to terminate the Saturn brand by 2011 if it is unable to sell, or "spin-off" the brand.

**B.**      **Procedural Background**

On November 20, 2008, Plaintiffs filed their Complaint alleging violations of both the New Jersey Franchise Practices Act, N.J.S.A. 56:10-1, *et. Seq*. ("NJFPA"), and the Automobile Dealer's Day in Court Act, 28 U.S.C. § 1221, *et seq*. ("ADDCA"). The Complaint also asserts claims for breach of contract, breach of the implied covenant of good faith and fair dealing, intentional interference with prospective economic advantage, and equitable estoppel. On January 20, 2009, GM filed a motion to dismiss for failure to state a claim. On February 17, 2009, Plaintiffs submitted their opposition to GM's motion. On February 24, 2009, Plaintiffs submitted a motion for a preliminary injunction and requested that this Court issue an Order to Show Cause why this Court should not grant a preliminary injunction. This Court issued an Order to Show Cause on February 27, 2009. Oral argument was heard on March 12, 2009.

**II.**      **GM's Motion to Supplement the record**

GM submitted a motion to supplement the record with information regarding Plaintiffs' financial position. A court has discretion to grant leave to supplement the record of a case. <u>See Edwards v. Pa. Tpk. Comm'n</u>, 80 F. Appx 261, 265 (3d Cir. 2003). Upon review of GM's submissions and Plaintiffs' opposition, it is the finding of this Court that the information GM wishes to add to the record will not effect the Court's determination of this matter. Therefore, GM's motion to supplement the record is **denied**. <u>Id.</u>

**III.**      **Standard of Review**

A court should grant preliminary injunctive relief where (1) the plaintiff has a reasonable probability of success on the merits; (2) the plaintiff faces immediate and irreparable harm; (3) the harm to the plaintiff outweighs any potential harm to the defendants; and (4) the public interest favors granting the plaintiff preliminary relief. <u>Saudi Basic Indus. Corp. v. Exxon Corp.</u>, 364 F.3d

106, 112 n.6 (3d Cir. 2004).  Preliminary injunction is an extraordinary remedy, "never to be indulged in except in a case clearly demanding it."  <u>Warner Bros. Pictures, Inc. v. Gittone</u>, 110 F.2d 292, 293 (3d Cir. 1940) (citations omitted).  A party seeking an injunction "to alter the status quo bears a particularly heavy burden in demonstrating its necessity."  <u>Acierno v. New Castle County</u>, 40 F.3d 645, 653 (3d Cir. 1994) (citing <u>Punnett v. Carter</u>, 621 F.2d 578, 582 (3d Cir. 1980)

## IV.    <u>Discussion</u>

Plaintiffs assert that GM's conduct over the last few years and most importantly GM's restructuring plan submitted to the federal government to obtain taxpayer money has resulted in the erosion of the Saturn brand, and abandonment of the Saturn philosophy.  Plaintiffs argue that GM's actions have resulted in the constructive termination of their franchise agreement.  Plaintiffs further argue that they need the requested preliminary injunction to survive because of the untenable position they have been placed in by GM's unilateral departure from Saturn's initial business plan and goals and the recent announcements made by GM.  Plaintiffs contend that GM's denial of their request was motivated by GM's interest in having fewer dealerships in operation by 2011, thus reducing its buy-out liability.

GM argues that it denied Plaintiffs' requests to preserve brand integrity and protect the value of Saturn.  GM further argues that its actions are in Plaintiffs long term best interest.  Additionally, GM asserts that it has tried to compromise with Plaintiffs by providing other options to allow Plaintiffs to open a KIA dealership.

### A.    <u>Likelihood of Success on the Merits</u>

The first prong of the preliminary injunction test requires a moving party to establish that it has a likelihood of succeeding on the merits.  <u>Instant Air Freight Co. v. C.F. Air Freight, Inc.</u>, 882 F.2d 797, 800 (3d Cir. 1989).  To demonstrate a likelihood of success on the merits a plaintiff need

only show a "reasonable probability" of prevailing on the merits.  Id.  "It is not necessary that the moving party's right to a final decision after trial be wholly without doubt; rather, the burden is on the party seeking relief to make a *prima facie* case showing a reasonable probability that it will prevail on the merits." Oburn v. Shapp, 521 F.2d 142, 148 (3d Cir. 1975).

Plaintiffs argue that GM's refusal to give them permission to add a KIA dealership to its Denville store has imposed unreasonable operating requirements on them in violation of the NJFPA. N.J.S.A. 56:10-7.4(a), provides that it shall be a violation of the NJFPA for any motor vehicle franchisor, directly or indirectly, through an officer, agent or employee, "to impose unreasonable standards of performance or unreasonable facilities, financial, operating, or other requirements upon a motor vehicle franchisee."  Plaintiffs argue that because they expanded their facility based on instructions from GM, declining sales, and GM's continual destruction of the Saturn brand, GM's refusal constitutes unreasonable facility and financial requirements.

In addition, Plaintiffs argue that GM only enforces the exclusivity clause when it suits GM and that this inconsistent application of the provision makes it more likely that the Court will find the exclusivity provision of the agreement between Plaintiffs and GM to be unreasonable.  Plaintiffs quote GMC v. New A.C. Chevrolet, 263 F.3d 296 (3d Cir. 2001) at length to demonstrate that the Third Circuit has proffered that exclusivity clauses in auto franchise agreements might impose unreasonable obligations on franchisees. The New A.C. Court however, merely explained that it was viable for New A.C. to challenge an exclusivity provision given New A.C.'s situation.  It did not hold that such provisions are untenable where they are disparately enforced.  See id. at 316.

GM argues that Plaintiffs signed a contract and a downturn in the economy cannot operate to transform a valid contractual provision into a violation of the NJFPA, the ADDCA or into grounds for Plaintiffs other claims.  GM further argues that it has acted in good faith as evidenced by its

willingness to consider other reasonable options to assist Plaintiffs, short of sanctioning the housing of a competing car line in the same facility to its own financial detriment.  GM responds to Plaintiffs disparate treatment argument by explaining that on only one occasion has Saturn allowed an exemption from the exclusivity provision for a "non-GM" line of vehicles however, in that case, GM owned a one-third interest in the "non-GM" line.  GM adds that Saturn only allowed dual dealerships in four or five other instances and they involved GM vehicle lines.  GM summarily contends that it is improbable that Plaintiffs will succeed because there is no New Jersey authority to support Plaintiffs position.

Plaintiffs respond to GM's argument that it has tried to provide Plaintiffs with other viable ways to open a KIA dealership by arguing that GM's suggestions are not viable.  Although not argued by Plaintiffs, the Court recognizes that GM's suggestions do not address Plaintiffs' concerns regarding the size of and the low sales realized at the Denville location.  Moreover, GM has seemingly irrationally drawn a distinction between having a competitive dealership in a separate building a foot away from one of its dealerships and having a shared building with no shared services.

GM has used the current economic conditions as justification to dramatically change the nature of the relationship it has with Plaintiffs.  GM has placed the Saturn brand at risk.  For these reasons Plaintiffs' constructive discharge claim might have merit however, Plaintiffs have not argued this point in their motion papers which limits the Court's ability to say that Plaintiffs have a reasonable probability of eventual success on this claim.  Despite GM's contention that it has acted in good faith, the evidence of record suggests otherwise.  GM says that it has provided Plaintiffs' with alternatives to dualing[2] the Denville facility however, GM being a sophisticated entity in the

---

[2]Dualing is an auto industry term for when two automobile brands are housed in the same facility.

business of selling cars and creating franchises must realize that its proposed alternatives do not alleviate Plaintiffs financial and efficiency concerns.

NJFPA does not allow a franchisor to impose unreasonable "facilities, financial, operating, or other requirements upon a motor vehicle franchisee." N.J.S.A. 56:10-7.4(a). GM's announcement that the Saturn brand might be discontinued by 2011 undoubtably effected brand confidence. Moreover, Plaintiffs' other allegations about GM's conduct if true would also constitute forms of brand destruction. Simply stated, as pleaded by Plaintiffs, GM's conduct over the last few years in conjunction with its refusal to allow Plaintiffs to dual their dealership appears to place unreasonable requirements on Plaintiffs. Therefore there is a reasonable probability that Plaintiffs' will be successful on the merits of their NJFPA claim satisfying the first prong of the preliminary injunction test.

### B.     Irreparable Harm

The second prong of the preliminary injunction test requires that the moving party establish that it will suffer irreparable harm if an injunction is not granted. Saudi Basic Indus. Corp., 364 F.3d at 112 n.6. Irreparable harm occurs when money damages are difficult to ascertain or would be inadequate. See In re Arthur Treacher's Franchise Litig., 689 F.2d 1137, 1146 (3d Cir. 1982). Irreparable injuries include "loss of control of reputation, loss of trade, and loss of good will." Opticians Ass'n of Am. v. Indep. Opticians of Am., 920 F.2d 187, 195 (3d Cir. 1990); see also Pappan Enters., v. Hardee's Food Sys., Inc., 143 F.3d 800, 805 (3d Cir. 1998). Moreover, "the loss of market share may be an irreparable injury." Ride The Ducks of Phila., LLC v. Duck Boat Tours, Inc., 138 Fed. Appx. 431, 434 (3d Cir. 2005). The Third Circuit has recognized that because "the payment of monies is involved does not automatically preclude a finding of irreparable injury." Morton v. Beyer, 822 F.2d 364, 372 (3d Cir. N.J. 1987) (citing United Steelworkers of Am. v. Fort

Pitt Steel Casting, 598 F.2d 1273, 1280 (3d Cir. 1979)).  The Third Circuit has emphasized that to be irreparable "'the injury must be of a peculiar nature, so that compensation in money cannot atone for it.'"  A. O. Smith Corp., 530 F.2d at 525 (citations omitted).  Third Circuit case law also weighs heavily against sustaining a finding of irreparable harm.  See, e.g., Moteles v. Univ. of Pennsylvania, 730 F.2d 913, 919 (3d Cir. 1984) (noting that injury from involuntary transfer is no more than an "inconvenience easily compensable by damages").

Plaintiffs argue that they will suffer irreparable harm if they are not permitted to add KIA to the Denville location because they will loose a significant business opportunity, and more importantly, will likely go out of business.  Plaintiffs further argue that injury or destruction of a business constitutes irreparable harm for which temporary, preliminary and permanent injunctive relief may be appropriate.  Atlantic City Coin & Slot Serv. Co. v. IGT, 14 F.Supp.2d 644, 667 (D.N.J. 1998).  Likewise, "loss of control of reputation, loss of trade, and loss of good will" have been found to constitute irreparable injury justifying preliminary injunction.  Opticians Asss'n. Of America v. Independent Opticians of America, 920 F.2d 187, 195 (3d Cir. 1990); EH Yacht, LLC v. Egg Harbor, LLC, 84 F. Supp. 2d 556. 570 (D.N.J. 2000).

GM argues that any injury suffered by Plaintiffs can be compensated by money damages and that Plaintiffs cannot claim harm because GM is merely exercising its contractual rights.

Plaintiffs seek to have the Court remove the exclusivity provision from their agreement with GM.  This in effect would change the status quo and allow Plaintiffs to dual with KIA.  Although Plaintiffs' plan seems reasonable and given the safeguards Plaintiffs have purposed the integrity of both the KIA and the Saturn brands would be protected, the relief Plaintiffs seek does not address the harm they identify.  Essentially, adding a KIA to the Denville location constitutes opening a new business and housing it in the same facility as Plaintiffs' Saturn business.  This might provide

Plaintiffs with a revenue stream to offset the cost of the facility, however, it would not protect the goodwill associated with Saturn of Denville, the loss of trade realized by Saturn of Denville, or the loss of control of Saturn of Denville's reputation. To the extent GM's conduct has damaged Saturn, the damage to Saturn of Denville is already done. A preliminary restraining order in this instance cannot prevent further damage or repair this damage. Allowing Plaintiffs to open a KIA might be financially helpful to Plaintiffs but it wont stop the destruction of their Saturn business. Stated another way, allowing Plaintiffs to sell KIAs might keep the doors at the Denville location open but it will not make the Saturn business anymore viable. In reality, Plaintiffs are looking for a revenue source to offset their Saturn losses. This suggests that money damages is the more appropriate remedy in this case.

The factual reality of Plaintiffs situation seems to support granting of an injunction, however, GM has properly argued that Plaintiffs cannot establish irreparable harm. This is a unique situation because of the extreme economic conditions and GM's public announcement that it intends to discontinue, sell, or "spin off" the Saturn brand. Plaintiffs are trying to take control of their future and protect themself and their employees. This notwithstanding, it is well-established that purely economic injury, compensable through the payment of money damages, does not satisfy the irreparable harm requirement for the issuance of a preliminary injunction. Frank's GMC Truck Crt. v. General Motors Corp., 847 F.2d 100, 102 (3d Cir. 1988). Even if Plaintiffs eventually go out of business, they can be made whole by money damages sufficient to allow them to reopen or to open another dealership for a different company like KIA. Therefore, Plaintiffs' injuries can be measured in monetary terms which means that they do not constitute irreparable harm and the extraordinary remedy of a preliminary injunction is not appropriate in this instance. Novartis Consumer Health, Inc. v. Johnson & Johnson-Merck Consumer Pharmaceuticals Co., 290 F.3d 578, 595 (3d Cir. 2002).

10

**B.      Balancing of the Harm Public Interest**

Where a plaintiff has failed to establish irreparable harm, the inquiry ends and a court does not need to consider the balancing of the harms nor the public interest components of the preliminary injunction analysis.  Tenafly Eruv Ass'n, Inc. v. Borough of Tenafly, 309 F.3d 144, 157 (3d Cir. 2002).  For this reason, the Court will not address the last two prongs of the preliminary injunction inquiry.

**V.      Conclusion**

For the reasons stated, it is the finding of this Court that Plaintiffs' motion for a preliminary injunction is **denied**; and GM's motion to supplement the record is **denied**.  An appropriate Order accompanies this Opinion.


                                                       S/ Dennis M. Cavanaugh
                                                      Dennis M. Cavanaugh, U.S.D.J.


Date:            April 6, 2009
Orig.:           Clerk
cc:              Counsel of Record
                 Hon. Mark Falk, U.S.M.J.
                 File