NOT FOR PUBLICATION

# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| SATURN OF DENVILLE NEW JERSEY, LP, and STUART LASSER,<br><br>     Plaintiffs,<br><br>     v.<br><br>GENERAL MOTORS CORP., SATURN DISTRIBUTION CORP. and SATURN CORP.,<br><br>     Defendants. | **Hon. Dennis M. Cavanaugh**<br><br>**OPINION**<br><br>Civil Action No. 08-CV-5734 (DMC) |

DENNIS M. CAVANAUGH, U.S.D.J.:

This matter comes before the Court upon motions by Plaintiffs, Saturn of Denville New Jersey, LP and Stuart Lasser ("Plaintiffs") for a preliminary injunction to enjoin Defendants, General Motors Corp., Saturn Distribution Corp., and Saturn Corp., ("GM") from enforcing an exclusivity provision in the dealership agreement between Plaintiffs and GM; and a Court Order compelling GM to post a bond to secure a judgement should Plaintiffs succeed in this litigation. After carefully considering the submissions of the parties, inconsideration of this Court's April 3, 2009, Opinion, and based upon the following, it is the finding of this Court that Plaintiffs' motion for a preliminary injunction is **granted**; and Plaintiff's motion for an Order to compel GM to post a bond is **denied**.

I.  **Background**[1]

A.  **Factual Background**

In the 1980s, Saturn Corp. ("Saturn") was founded as a people oriented organization with a focus on core values and accountability to customers, retailers and employees. From the outset,

---

[1] The facts set-forth in this Opinion are taken from the Parties' respective papers.

Saturn distinguished itself from its parent, GM, and all other companies in the market; this is evidenced by Saturn's original slogan, "A Different Kind of Company. A Different Kind of Car." This new approach extended to its dealerships. Dealers were expected to expend a great deal of time and effort to create the desired sales environment.

As part of Saturn's search for new retailers, it approached Plaintiff, Stuart Lasser, a veteran automobile dealer in northern New Jersey. Mr. Lasser was eventually persuaded to adopt the Saturn philosophy. In April 1991, Saturn of Denville opened on Route 10 in Denville, New Jersey. As the brand became established, Saturn advised retailers to expect expanded sales. In 1997, Saturn advised its dealers that increased sales volume would require additional sales and service facilities in most marketing areas including Plaintiffs'. In reliance on these promises, Plaintiffs undertook efforts, and incurred significant expense to secure additional properties. Plaintiffs also enlarged and updated their showroom and service areas at the Denville location.

In 1999, with sales slipping and no new products on the horizon, Saturn turned away from its founding philosophies and adopted traditional "price-based" marketing. GM became more involved in Saturn's operations and eventually brought the Saturn brand into the GM fold. This resulted in Saturn sharing its engineering, design, and marketing efforts with other GM brands. Plaintiffs allege that GM started using Saturn to "test market" new vehicles for its other divisions. They claim that every new car model launched since 2003, including all models in its current line are not exclusive to Saturn. Moreover, contrary to the customary approach to new product introductions, Saturn launched each of its new models with little fanfare, inadequate incentives, and limited advertising budgets. In contrast, the introductions of similar models by the other GM brands were accompanied by increased incentives and substantially larger marketing budgets. Having been effected by a lack of unique models, limited advertising, and low incentives over the past several years, sales of Saturn vehicles have decreased dramatically.

2

Plaintiffs have operated a Saturn Dealership in good standing for over eighteen years. In July 2008, GM's newly appointed General Sales Manager, Mr. Sterling Wesley, called a meeting of all Saturn retailers in the New York District marketing area, including Plaintiffs. During this meeting, Mr. Wesley advised the retailers in attendance that GM was "out of money" and instructed the dealer that they were on their own and should "do what they had to do" to survive. In reaction to this meeting, Plaintiffs submitted an application to obtain a KIA franchise with the intention of combining the Saturn facility with a KIA dealership. Plaintiffs planned to subdivide the building and offer exclusive retail sales areas to both brands.

On August 12, 2008, Plaintiffs received official notification from KIA that its application was approved subject to GM approval. On August 15, 2008, Plaintiffs sought GM approval. Plaintiffs' proposal outlined a detailed plan explaining how Plaintiffs would protect the integrity of both brands. For example, the plan included separate entrances for the Saturn and KIA showrooms. Saturn denied Plaintiffs' request. On September 22, 2008, Plaintiffs asked for reconsideration of its request. On September 26, 2008, Jonathan Skidmore, Saturn's Regional Manager, requested a more comprehensive presentation. Plaintiffs responded with a more detailed proposal wherein Plaintiffs added plans for separate customer service areas. By letter dated October 30, 2008, Saturn denied Plaintiffs' second request. On February 17, 2009, GM filed an updated plan for its long term financial viability with the Department of Treasury as part of a submission requesting an additional $16.6 billion from the United States taxpayers. Within this plan GM reiterated that it will focus its attention and resources, on its four "core brands." GM committed to cutting labor, closing manufacturing plants, and eliminating dealerships. Saturn is not one of GM's core brands. In fact, GM recently announced its intention to terminate the Saturn brand by 2011 if it is unable to sell, or "spin-off" the brand.

On April 27, 2009, GM presented an updated Plan for Long-Term Viability (the "Updated Plan") to the United States Treasury Department. The Updated Plan moved up the termination of Saturn to the end of 2009, at the latest, instead of the previously planned 2011. As part of this plan GM announced that it would halt the production of Saturn vehicles in August 2009. The Updated Plan however, is contingent on GM not being able to find a purchaser for Saturn.

### B.    Procedural Background

On November 20, 2008, Plaintiffs filed their Complaint alleging violations of both the New Jersey Franchise Practices Act, N.J.S.A. 56:10-1, *et. Seq*. ("NJFPA"), and the Automobile Dealer's Day in Court Act, 28 U.S.C. § 1221, *et seq*. ("ADDCA"). The Complaint also asserts claims for breach of contract, breach of the implied covenant of good faith and fair dealing, intentional interference with prospective economic advantage, and equitable estoppel. On January 20, 2009, GM filed a motion to dismiss for failure to state a claim. On February 17, 2009, Plaintiffs submitted their opposition to GM's motion. On February 24, 2009, Plaintiffs submitted a motion for a preliminary injunction and requested that this Court issue an Order to Show Cause why this Court should not grant a preliminary injunction. This Court issued an Order to Show Cause on February 27, 2009. Oral argument was heard on March 12, 2009. An Opinion and Order were issued on April 3, 2009 denying Plaintiffs' application. On May 8, 2009, Plaintiff's renewed their request for emergent relief because of changed circumstances.

### II.    Standard of Review

A court should grant preliminary injunctive relief where (1) the plaintiff has a reasonable probability of success on the merits; (2) the plaintiff faces immediate and irreparable harm; (3) the harm to the plaintiff outweighs any potential harm to the defendants; and (4) the public interest favors granting the plaintiff preliminary relief. Saudi Basic Indus. Corp. v. Exxon Corp., 364 F.3d

106, 112 n.6 (3d Cir. 2004).  Preliminary injunction is an extraordinary remedy, "never to be indulged in except in a case clearly demanding it."  Warner Bros. Pictures, Inc. v. Gittone, 110 F.2d 292, 293 (3d Cir. 1940) (citations omitted).  A party seeking an injunction "to alter the status quo bears a particularly heavy burden in demonstrating its necessity."  Acierno v. New Castle County, 40 F.3d 645, 653 (3d Cir. 1994) (citing Punnett v. Carter, 621 F.2d 578, 582 (3d Cir. 1980)

## III.   Discussion

Plaintiffs assert that GM's conduct over the last few years and most importantly GM's Updated Plan has resulted in the erosion of the Saturn brand, and abandonment of the Saturn philosophy.  Plaintiffs argue that GM's actions have resulted in the constructive termination of their franchise agreement.  Plaintiffs further argue that they need the requested preliminary injunction to survive because of the untenable position they have been placed in by GM's unilateral departure from Saturn's initial business plan and goals and the recent announcements made by GM.  Plaintiffs contend that GM's denial of their request is motivated by GM's interest in having fewer dealerships in operation by 2011, thus reducing its buy-out liability.

GM argues that it denied Plaintiffs' requests to sell KIA vehicles in order to preserve brand integrity and protect the value of Saturn.  GM further argues that its actions are in Plaintiffs long term best interest.  Additionally, GM asserts that it has tried to compromise with Plaintiffs by providing other options to allow Plaintiffs to open a KIA dealership.

### A.    Likelihood of Success on the Merits

The first prong of the preliminary injunction test requires a moving party to establish that it has a likelihood of succeeding on the merits.  Instant Air Freight Co. v. C.F. Air Freight, Inc., 882 F.2d 797, 800 (3d Cir. 1989).  To demonstrate a likelihood of success on the merits a plaintiff need only show a "reasonable probability" of prevailing on the merits.  Id.  "It is not necessary that the

moving party's right to a final decision after trial be wholly without doubt; rather, the burden is on the party seeking relief to make a *prima facie* case showing a reasonable probability that it will prevail on the merits." Oburn v. Shapp, 521 F.2d 142, 148 (3d Cir. 1975).

Plaintiffs argue that GM's refusal to give them permission to add a KIA dealership to its Denville store has imposed unreasonable operating requirements on them in violation of the NJFPA. N.J.S.A. 56:10-7.4(a), provides that it shall be a violation of the NJFPA for any motor vehicle franchisor, directly or indirectly, through an officer, agent or employee, "to impose unreasonable standards of performance or unreasonable facilities, financial, operating, or other requirements upon a motor vehicle franchisee." Plaintiffs argue that because they expanded their facility based on instructions from GM, declining sales, and GM's continual destruction of the Saturn brand, GM's refusal constitutes unreasonable facility and financial requirements.

In addition, Plaintiffs argue that GM only enforces the exclusivity clause when it suits GM and that this inconsistent application of the provision makes it more likely that the Court will find the exclusivity provision of the agreement between Plaintiffs and GM to be unreasonable. Plaintiffs quote GMC v. New A.C. Chevrolet, 263 F.3d 296 (3d Cir. 2001) at length to demonstrate that the Third Circuit has proffered that exclusivity clauses in auto franchise agreements might impose unreasonable obligations on franchisees. The New A.C. Court however, merely explained that it was viable for New A.C. to challenge an exclusivity provision given New A.C.'s situation. It did not hold that such provisions are untenable where they are disparately enforced. See id. at 316.

GM argues that Plaintiffs signed a contract and a downturn in the economy cannot operate to transform a valid contractual provision into a violation of the NJFPA, the ADDCA or into grounds for Plaintiffs other claims. GM further argues that it has acted in good faith as evidenced by its willingness to consider other reasonable options to assist Plaintiffs, short of sanctioning the housing

6

of a competing car line in the same facility to its own financial detriment. GM responds to Plaintiffs disparate treatment argument by explaining that only on one occasion has Saturn allowed an exemption from the exclusivity provision for a "non-GM" line of vehicles however, in that case, GM owned a one-third interest in the "non-GM" line. GM adds that Saturn only allowed dual dealerships in four or five other instances and they involved GM vehicle lines. GM summarily contends that it is improbable that Plaintiffs will succeed because there is no New Jersey authority to support Plaintiffs position.

Plaintiffs respond to GM's argument that it has tried to provide Plaintiffs with other viable ways to open a KIA dealership by arguing that GM's suggestions are not viable. Although not argued by Plaintiffs, the Court recognizes that GM's suggestions do not address Plaintiffs' concerns regarding the size of and the low sales realized at the Denville location. Moreover, GM has seemingly irrationally drawn a distinction between having a competitive dealership in a separate building a foot away from one of its dealerships and having a shared building with no shared services. This seems to be a distinction without a difference.

GM has used the current economic conditions as justification to dramatically change the nature of the relationship it has with Plaintiffs. GM has placed the Saturn brand at risk. For these reasons Plaintiffs' constructive discharge claim might have merit, however, Plaintiffs have not argued this point in their motion papers which limits the Court's ability to say that Plaintiffs have a reasonable probability of eventual success on this claim. Despite GM's contention that it has acted in good faith, the evidence of record suggests otherwise. GM says that it has provided Plaintiffs' with alternatives to dualing[2] the Denville facility, however, GM being a sophisticated entity in the business of selling cars and creating franchises must realize that its proposed alternatives do not

---

[2]Dualing is an auto industry term used when two automobile brands are housed in the same facility.

alleviate Plaintiffs financial and efficiency concerns.

NJFPA does not allow a franchisor to impose unreasonable "facilities, financial, operating, or other requirements upon a motor vehicle franchisee." N.J.S.A. 56:10-7.4(a). GM's announcement that the Saturn brand might be discontinued by 2011 undoubtably effected brand confidence. This effect is compounded by GM's recent change of the Saturn brand termination date to the end of 2009. Moreover, Plaintiffs' other allegations concerning GM's conduct, if true, would also constitute forms of brand destruction. Simply stated, as pleaded by Plaintiffs, GM's conduct over the last few years in conjunction with its refusal to allow Plaintiffs to dual their dealership appears to place unreasonable requirements on Plaintiffs. Therefore there is a reasonable probability that Plaintiffs' will be successful on the merits of their NJFPA claim satisfying the first prong of the preliminary injunction test.

### B.      Irreparable Harm

The second prong of the preliminary injunction test requires that the moving party establish that it will suffer irreparable harm if an injunction is not granted. Saudi Basic Indus. Corp., 364 F.3d at 112 n.6. Irreparable harm occurs when money damages are difficult to ascertain or would be inadequate. See In re Arthur Treacher's Franchise Litig., 689 F.2d 1137, 1146 (3d Cir. 1982). Irreparable injuries include "loss of control of reputation, loss of trade, and loss of good will." Opticians Ass'n of Am. v. Indep. Opticians of Am., 920 F.2d 187, 195 (3d Cir. 1990); see also Pappan Enters., v. Hardee's Food Sys., Inc., 143 F.3d 800, 805 (3d Cir. 1998). Moreover, "loss of market share may be an irreparable injury." Ride The Ducks of Phila., LLC v. Duck Boat Tours, Inc., 138 Fed. Appx. 431, 434 (3d Cir. 2005). The Third Circuit has emphasized that to be irreparable "'the injury must be of a peculiar nature, so that compensation in money cannot atone for it.'" A. O. Smith Corp., 530 F.2d at 525 (citations omitted). This notwithstanding, "the fact that the

8

payment of monies is involved does not automatically preclude a finding of irreparable injury." Morton v. Beyer, 822 F.2d 364, 372 (3d Cir. 1987) (citing United Steelworkers of Am. v. Fort Pitt Steel Casting, 598 F.2d 1273, 1280 (3d Cir. 1979)). To this end, in Hoxworth v. Blinder, Robinson & Co., the Third Circuit determined that a district court may issue a preliminary injunction to protect a potential future damages remedy, provided that the plaintiff demonstrated that the traditional requirements for obtaining equitable relief had been met. 903 F.2d 186, 196-97 (3d Cir. 1990); see Local 397, International Union of Electronic, etc. v. Midwest Fasteners, Inc., 763 F. Supp. 78, 82 (D.N.J. 1990). Nonetheless, Third Circuit case law also weighs heavily against sustaining a finding of irreparable harm. See, e.g., Moteles v. Univ. of Pennsylvania, 730 F.2d 913, 919 (3d Cir. 1984) (noting that injury from involuntary transfer is no more than an "inconvenience easily compensable by damages").

Plaintiffs argue that they will suffer irreparable harm if they are not permitted to add KIA to the Denville location because they will lose a significant business opportunity, and more importantly, will likely go out of business. Plaintiffs further argue that injury or destruction of a business constitutes irreparable harm for which temporary, preliminary and permanent injunctive relief may be appropriate. Atlantic City Coin & Slot Serv. Co. v. IGT, 14 F.Supp.2d 644, 667 (D.N.J. 1998). Likewise, "loss of control of reputation, loss of trade, and loss of good will" have been found to constitute irreparable injury justifying preliminary injunction. Opticians Asss'n. Of America v. Independent Opticians of America, 920 F.2d 187, 195 (3d Cir. 1990); EH Yacht, LLC v. Egg Harbor, LLC, 84 F. Supp. 2d 556. 570 (D.N.J. 2000). Additionally, Plaintiffs address this Court's conclusion in its April Opinion that money damages would be sufficient by asserting that GM would not be able to pay any money damages because GM is facing bankruptcy and has announced that it is experiencing significant financial hardship.

GM argues that any injury suffered by Plaintiffs can be compensated by money damages and that Plaintiffs cannot claim harm because GM is merely exercising its contractual rights.

Plaintiffs seek to have this Court nullify the exclusivity provision from their agreement with GM. Plaintiffs' plan seems reasonable and given the safeguards Plaintiffs have proposed, the integrity of both the KIA and the Saturn brands would be protected. Importantly, allowing Plaintiffs to dual with KIA could prevent Plaintiffs from experiencing any harm because of GM's previous unwillingness to allow Plaintiffs to split its existing building in half. Circumstances have changed since this Court's April Opinion. GM's Updated Plan demonstrates how arbitrary GM has behaved and its willingness to undermine Plaintiffs' ability to operate and forecast for the future.

When GM gave a potential termination date of 2011 the Court considered the fact that Plaintiffs and GM had two years to operate together and to reach an understanding. Now, GM has changed the equation and has done so without any real notice to Plaintiffs. The reality is, there is nothing stopping GM from terminating Saturn immediately. In reaching a decision on this issue in April, this Court was persuaded by GM's argument that termination was speculative because the parties had until 2011. This is no longer the case, the termination of Saturn by the end of 2009 is much more imminent and coupled with Plaintiffs' assertion that it will go out of business if not allowed to dual, the Court is compelled to change its conclusion that money damages would be sufficient. Moreover, even if money damages were sufficient the impending bankruptcy of GM is a further change in circumstances. Previously, GM represented that there was a number of ways that bankruptcy could be avoided. Seemingly, there are now few options at GM's disposal and bankruptcy might be unavoidable.

Courts have found irreparable harm where the ability of a defendant to pay a potential money damages award is unlikely, as is the case here. See Tanimura & Antle, Inc. v. Packed Fresh Produce,

Inc., 222 F.3d 132, 141 (3d Cir. N.J. 2000). "Even if a loss is fully compensable by an award of money damages, however, extraordinary circumstances, such as a risk that the defendant will become insolvent before a judgment can be collected, may give rise to the irreparable harm necessary for a preliminary injunction." 11A Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 2948.1 (2009); Marsellis-Warner Corp. v. Rabens,, 51 F.Supp.2d 508, 531 (D. N. J.1999); Hoxworth, 903 F.2d at 196. This is an extraordinary situation because of the extreme economic conditions and GM's public announcements. The mere size of GM and the amount of debt GM owes persuades the Court that there is a high probability that a creditor in Plaintiffs' position will have an extremely difficult time collecting a judgment against GM. Allowing Plaintiffs' business to continue to erode would amount to irreparable harm. Likewise, forcing Plaintiffs to wait for a money judgment when it appears unlikely that they will be able to collect, could also subject Plaintiffs to irreparable harm.

Given the current state of GM and Plaintiffs' business, equity demands that Plaintiffs be allowed to lookout for their future viability and the interests of their employees. As a result of GM's continual changes to the conditions of its relationship with Plaintiffs; because of the change in circumstances since this Court's April decision and the fact that Plaintiffs are not likely to be able to collect money damages should they succeed in this litigation, it appears that Plaintiffs will be irreparably harmed if an injunction preventing the enforcement of the exclusivity provision in the agreement between GM and Plaintiffs is not granted.

**C.     Balancing of the Harm**

The third prong of the injunctive relief analysis requires that the Court determine the possibility of harm to others including the party against whom injunctive relief is sought against. Here, there is a limited likelihood that granting Plaintiffs injunctive relief could result in a decrease in sales of Saturns at the Denville location. GM argues that a dual dealership will decrease the value

of the Saturn brand and possibly impede the sale of the brand. Although these examples of harm seem unlikely and are unpersuasive, in order to protect against these realities Plaintiffs are willing to place a temporary divider in the Denville location to create virtually two sales environments and to remove KIA to a second facility if the Saturn brand is sold and the purchaser requires this. With these caveats in place, the Court concludes there is a low risk of harm to others. On balance, the potential for harm is greater if injunctive relief is not granted.

### D.      Public Interest

The last prong of the analysis requires the Court to consider whether granting injunctive relief is in the public interest. Allowing Plaintiffs to stay in business is in the public interest. It will preserve jobs and the productive use of property. Moreover, injunctive relief would allow Plaintiffs to keep a Saturn dealership open while introducing a KIA dealership to the area which will provide more options to the public as apposed to fewer. Therefore, the public interest prong of the analysis weighs in favor of injunctive relief.

### E.      Plaintiffs' Request that GM Post a Bond

The Court declines to address Plaintiffs' request as it raises issues of irreparable harm to GM. Requiring GM to post a bond tying up funds that could be used for other purposes at this time could contribute to GM's financial problems and impede its efforts to remain solvent. Moreover, this relief would be somewhat redundant given that the Court has granted injunctive relief.

### F.      Security

In accordance with Fed. R. Civ. P. 65.1(c) this Court will require Plaintiffs to post security in the amount of $25,000 in order to cover costs and damages sustained by GM should it be determined that GM was wrongfully enjoined or restrained.

12

**IV.    Conclusion**

For the reasons stated, it is the finding of this Court that Plaintiffs' motion for a preliminary

injunction is **granted**; and Plaintiffs' motion for an Order Compelling GM to post a bond is **denied**.

An appropriate Order accompanies this Opinion.

Dennis M. Cavanaugh, U.S.D.J.

Date:       May **29**, 2009
Orig.:      Clerk
cc:         Counsel of Record
            Hon. Mark Falk, U.S.M.J.
            File

13